IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | CRIMINAL INDICTMENT NO. |
| v. | ) | 120-CR-185 |
| | ) | |
| JACQUES MATHIEU and | ) | |
| KERLINE MATHIEU, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT JACQUES MATHIEU'S SENTENCING MEMORANDUM

Defendant, JACQUES MATHIEU, comes before the Court for sentencing after having pled guilty to one count of "smuggling goods from the United States" Mr. Mathieu submits this sentencing memorandum to aid the Court in determining an appropriate sentence under 18 U.S.C. § 3553(a). The U.S. Probation Office ("Probation") has calculated, under the U.S. sentencing Guidelines (the "Guidelines", a sentencing range of forty-six (46) to fifty-seven (57) months in prison. The count of conviction, however, carry a statutorily authorized maximum term of imprisonment of ten (10) years as to Count.

## INTRODUCTION

Mr. Mathieu is a hard-working citizen who has provided for his family and his community for years. He has coped with various chronic illnesses, which has not stopped him from being well-known in his neighborhood as an overall giving person. The government has yet to see this factor and has chosen to demand that Mr. Mathieu serve time in prison for the crime committed, however, this is no murder or drug crime, rather a mere mistake made by Mr. Mathieu. He now knows the

consequences of his actions and has accepted complete responsibility for his actions by pleading guilty to this conduct. As argued by the government, Mr. Mathieu is suspected of supplying ammunition and firearms to the Haitian government, however, Mr. Mathieu was simply trying to supply his newfound security business he was trying to establish in Haiti. The reasoning behind leaving the ammunition out of the shipping reports is due to Mr. Mathieu being in fear of his life while trying to import these goods out of the United States. Haiti, being a third world country, Mr. Mathieu has experienced on several occasions' items being stolen throughout the transportation process of his belongings to Haiti during his travels. If the Haitian locals were aware of the contents of his belongings, these items would have been either stolen from the shipment directly, or Mr. Mathieu would have been the subject of a more serious robbery, putting his life at risk.

## **BACKGROUND**

Mr. Mathieu, is fifty-one years of age, born in Port au Prince, Haiti, but immigrated to America in 1988. Prior to immigrating to America, him and his family had to live under the turmoil experienced in the Haitian government with various protests (See Exhibit 'A,' for a New York Times article discussing the unrest and violence during this time.) ("Haiti's Ordeal: The Years Of Strife," New York Times. 1988 Sep 19: Sect, A: 11, https://www.nytimes.com/198 8/09/19/world/haiti-s-ordeal-the-years-of-strife.html.) Him and his family immigrated to Queens, New York, to seek refuge and to start a peaceful life.

Mr. Mathieu has been gainfully employed starting in 2995 as a cross-country truck driver in, which he practiced until 2004 when his eyesight started to fail, and his CDL license had expired. In or around 2004 he relocated to Atlanta, Georgia, to seek new business opportunities. While trying to cope this failing eyesight, he managed to find employment with JKM Car Sales from 2004 to 2015, where he bought and sold used cars to his local community. Afterwards beginning

in 2015 he worked part-time at his business A-Tax until his arrest on February 27, 2020. He started this business with his ex-wife, which they are now attempting to grow, having one location in Stone Mountain and another in Tucker. As of October 20, 2020, he has worked for this company full-time. His brief unemployment is due to his incarceration from February 27, 2020 to October 19, 2020. During this time, although difficult with the COVID-19 pandemic and her business partner not being readily available, his ex-wife managed to keep the business running.

He suffers from high blood pressure and diabetes, which he is prescribed Adolophone, Glimepiride, Meteformin, and Farxiga for his treatment. In 2016 he had surgery on his left due to a medical condition and receives a shot every three months at Grady Hospital to avoid hemorrhaging. Mr. Mathieu's eyesight is failing and will require surgery on his right eye soon before losing his vision completely.

Throughout his time in Atlanta, he married his now ex-wife, Ms. Kerline Mathieu, and they had three daughters, all of which are still minors. He currently voluntarily supports all three children and his ex-wife. Mr. Mathieu's mother, age 77, currently lives in New York where she resides in an assisted nursing home. His father, age 91, resides in Haiti, who is a retired congressman from this country.

Mr. Mathieu is well-known in his community both here in America and in Haiti. He is active in his local church and has donated on several occasions' food and other goods to his community members in need. In Haiti, he provides for multiple people in his community, including donations to those in need. Mr. Mathieu and his ex-wife support various families in Haiti, providing necessities to these "adopted" families. While on his travels to and from Haiti, he made it a necessity to visit those in need to provide the support whenever he could. Since Mr. Mathieu is well-traveled in Haiti, he has also attempted to start up multiple small businesses there, one

being a small security business, in order to help protect his community. Due to the unrest this country can be prone to, Mr. Mathieu wanted to create a more permanent solution for members of his neighborhood to look for protection against some of the street violence that is unfortunately common in this area. Due to his incarceration these business plans have come to a halt since he is not able to return to Haiti at the moment.

Throughout his time in home detention, Mr. Mathieu has been an outstanding citizen. He has not violated his parole since being released on April 2, 2020 from a bond of $20,000.00. Throughout the process of his incarnation, he has been compliant and forthcoming with evidence pertaining to this case. He presents little risk to anyone. Mr. Mathieu is now fully aware of the consequences of his actions and accepts all responsibility. A jail sentence is not called for in this case and would not further the statutory goals of sentencing.

## ARGUMENT

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of the statue. In undertaking its analysis, the Court considers the advisory sentencing range recommended by the Guidelines and any relevant Guideline policy statement, as well as other traditional sentencing factors, such as:

(1) The nature of the offense and history and characteristics of the defendant;

(2) The purpose of sentencing;

(3) The kinds of sentences available;

(4) The Sentencing Guidelines;

(5) Pertinent policy statements issued by the Sentencing Commission;

(6) The need to avoid unwarranted disparities among similar offenders; and

(7) The need to provide restitution to victims.

18 U.S.C. § 3553(a).

Nearly twenty (20) years after the Supreme Court's decision in *Unites States v. Bokker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines -that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (ad Cir. 2008) (*en banc*). The Guidelines are no longer "the only consideration" at sentencing. Rather the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Id.; accord Cunningham v. California*, 549 U.S. 270 (2007). The Court is to impose its sentence after "mak[ing] an individual assessment based on the facts presented" in each particular case. *Id.* The Court need *not* find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* At 47.

The Supreme Court's decisions in above mentioned cases, significantly broadened the discretion and authority of courts to impose a less stringent sentence than the one suggested by the Guidelines, and in this case the Court should exercise its broad discretion and impose a sentence outside of the suggested Guidelines, removing the imprisonment time to a supervised parole. Mr. Mathieu has pled guilty and accepted responsibility for his actions, had been held in confinement from February 27, 2020 to April 20, 2020 and has been on home detention since that date. He has shown remorse for his actions and suffered the consequences as such.

## 1. The Nature and Circumstances of the Offense

In this case, Mr. Mathieu pled guilty to "smuggling goods from the United States." The offense conduct is set forth in detail in the Criminal Indictment filed on June 2, 2020, which Mr.

Mathieu accepted during his please hearing. Therefore, the offense conduct is briefly summarized below.

In regard to the smuggling charge, Mr. Mathieu has admitted that he transported goods from the Unite States into Haiti but failed to register these items on the shipping records while transporting his own belongings to Haiti for his stay. Mr. Mathieu traveled to and from Haiti multiple times a year for his startup businesses, to visit family and friends, and to give back to his community. Mr. Mathieu was unaware during this time that transporting goods from the United States was a federal crime.

## 2. The History and Characteristics of the Defendant

## AGE AND HEALTH CONCERNS

Mr. Mathieu's age and various health problems suggest that any time in prison could lead to a rapid decrease in his health. In a study done by Kimberly A. Skarupski, Alden Gross, Jennifer A. Schrack, Jennifer A. Deal, and Gabreil B. Eber, the unhealthy lifestyles and inadequate health care that most incarcerated individuals experience throughout their time in prison can lead to a rapid degression of one's health and an increase in the progression of chronic conditions (Kimberly A Skarupski, Alden Gross, Jennifer A Schrack, Jennifer A Deal, Gabriel B Eber, "The Health of America's Aging Prison Population," *Epidemiologic Reviews*, Volume 40, Issue 1, 2018, Pages 157–165, https://doi.org/10.1093/epirev/mxx020). Mr. Mathieu, as stated previously, experiences high blood pressure and diabetes, which he is on multiple medications for. He also experiences failing eyesight, to which he has had a previous surgery to fix for his left eye, which still needs to seek medical assistance every three months to avoid complete loss of eyesight from the left eye. His right eye has significantly lost most of its sight, and Mr. Mathieu would need surgery to reverse

the effects of his medical condition. With this, Mr. Mathieu's health could falter if left to spend any amount of time in prison, with the possibility of completely losing his eyesight.

### 3. Purpose of Sentencing and Reasoning

The Purpose of Sentencing Pursuant to the sentencing statute, a defendant's sentence should be designed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.] 18 U.S.C. § 3553(a)(2).

Let it be known, Mr. Mathieu does not dispute his guilt, but these factors do not warrant a prison sentence in this case. As stated above, Mr. Mathieu is an outstanding citizen and has not violated his parole and has been complaint throughout the investigation and case. He contends that he was not providing goods to the Haitian government, instead all goods were for his personal use or for his business startup in Haiti. Upon his arrest Mr. Mathieu voluntarily waived his rights and disclosed that the goods were his without being evasive or devious.

The charge in this case and all the consequences Mr. Mathieu has already suffered, including his incarceration from February to April, vast media coverage that could ruin his reputation and destroy his business, and substantial financial punishments. Mr. Mathieu is deeply remorseful for his actions, now knowing the seriousness of them. With these consequences already laid out, he is not at risk of any recidivism in light of the lesson Mr. Mathieu has learned from partaking in his actions. There is no reason to believe that any number of years in prison is necessary to prevent Mr. Mathieu from committing any further crimes against the government. He

poses no risk to himself or to the general public and is no need of educational or vocational training. Medical care, or other treatment that would require any imprisonment sentence.

The Court's have discretion to implement a variety of alternative sentences for Mr. Mathieu's actions to the prison term contemplated by the Guidelines or the maximum penalty authorized under the relevant states. *See* 18 U.S.C. § 3553 (a)(3) and § 3561 (a)(1). Mr. Mathieu has accepted any and responsibilities for his actions and has suffered great consequences thus far. For these reasons, the defendant requests that this court should impose a sentence that will run concurrent to any undischarged term of imprisonment.

## <u>CONCLUSION</u>

For all of the foregoing reasons, we respectfully request that the Court imposes a sentence significantly below the statutory maximum sentence in this case.

Respectfully submitted,

Frank W. Hicks, III, Esq.
John B. Miller & Associates PC
PO Box 675433
Marietta GA   30006
fhicks@johnbmillerlaw.com
Attorney for Defendant

**EXHIBIT A**

Haiti's Ordeal: The Years Of Strife - The New York Times

**The New York Times** | https://nyti.ms/29mQKF3

# Haiti's Ordeal: The Years Of Strife

Sept. 19, 1988



See the article in its original context from
September 19, 1988, Section A, Page 11    Buy Reprints

New York Times subscribers* enjoy full
access to TimesMachine—view over
150 years of New York Times
journalism, as it originally appeared.

**SUBSCRIBE**

*Does not include Crossword-
only or Cooking-only
subscribers.

**About the Archive**

*This is a digitized version of an article from The Times's print archive, before the start of online
publication in 1996. To preserve these articles as they originally appeared, The Times does not alter,*

Haiti's Ordeal: The Years Of Strife - The New York Times

*edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

985 November: Although President Jean-Claude Duvalier had announced a series of political reforms earlier in the year, anti-government rioting breaks out when several teen-agers are killed during a demonstration. December: President Duvalier reshuffles his Government, shifting power to an inner circle of hard-liners.

**COOKING:** *Daily inspiration, delicious recipes and other updates from Sam Sifton and NYT Cooking.*

Sign Up

He relies increasingly on the Tontons Macoute, his personal police force, which is widely feared by his political opponents. 1986 Jan. 8: Student boycott leads authorities to close schools and universities. Jan. 18: Police disperse first major protest in Port-au-Prince. President Duvalier imposes state of siege and martial law. Feb. 7: President Duvalier, who had succeeded his father, Francois, as ruler of the country in 1971, flees with his family into exile in France. A civilian-military junta headed by Lieut. Gen. Henri Namphy takes power. Brig. Gen. Prosper Avril is an adviser. Feb. 10: A 19-member Provisional Government is formed, including some prominent Duvalier supporters. The regime dissolves the Assembly and the Tontons Macoute. March-April: Initial euphoria fades as Haiti's economic condition fails to improve. Anti-government riots break out. General Avril resigns under pressure and others identified with the Duvaliers are dropped from the National Council. June 6: General Namphy sets municipal elections for July 1987, with presidential and legislative elections the following November. Oct.19: Voters, in a low turnout, elect 41 of 61 members of a Constituent Assembly to draft the nation's 23d Constitution since independence in 1804. 1987 March 29: A new Constitution, with safeguards to prevent the return of a Duvalier-style dictatorship, is approved in a referendum. Elections for president and National Assembly are to be run by a civilian commission. June 6: General Namphy supersedes the commission, provoking demonstrations that end in the killings of 30 protesters. He backs down 10 days later. Nov. 2-4: Headquarters of the election commission are gutted by fire. Violence drives the commission into hiding after it rejects a dozen Duvalier associates as presidential candidates. Nov. 29: On Election Day, polling places are attacked by gunmen, 34 voters are slain and balloting is called off. General Namphy dissolves the election commission. When elections are rescheduled for Jan. 17, regime's opponents say they will boycott. 1988 Jan. 17:

Leslie F. Manigat, a university professor who spent most of the Duvalier years in exile, is elected president in a small voter turnout. He is inaugurated on Feb. 7, two years to the day after Mr. Duvalier fled. June 14: General Namphy, as commander-in-chief of the armed forces, transfers or retires several high-ranking officers. He is overruled by President Manigat, who orders him held under house arrest. June 19: Troops loyal to General Namphy release him and storm the National Palace, deposing President Manigat, who escapes to the Dominican Republic as General Namphy declares himself president, abolishes the Assembly and appoints a new Cabinet. Sept. 11: Nine people are killed and 77 wounded and a Port-au-Prince church run by a dissident priest is burned down as soldiers look on but do not intervene. When an empty Roman Catholic chapel is set afire two days later, the opposition blames General Namphy for both attacks. Sept. 17: General Namphy is ousted by a military coup and taken to the Port-au-Prince airport, from which he flies to the Dominican Republic and exile. Gunfire breaks out at Presidential Palace between army factions. Sept. 18: General Avril says he has assumed presidency.

A version of this article appears in print on , Section A, Page 11 of the National edition with the headline: Haiti's Ordeal: The Years Of Strife